## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SIMONE BOEHM,

      Petitioner,

                                             Case No. 8:10-CV-1986-T-27TGW

v.

CHRISTIAN W. BOEHM,

      Respondent.

_____/

## ORDER

**BEFORE THE COURT** is a Petition for Return of Child to Petitioner brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-10 (Dkt. 1). Upon consideration, the petition is DENIED.

Petitioner filed this Hague Convention action alleging that Respondent wrongfully removed their minor child from Germany, wrongfully retained the child in Austria, and wrongfully removed her the United States. She contends that the child's habitual residence immediately prior to her removal and retention was Germany.[1]

---

[1] The United States and Germany are Contracting States to the Convention. *See* Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

For the reasons stated on the record at the conclusion of the evidentiary hearing, including the factual findings and conclusions of law recited which are incorporated herein by reference, the court concludes that Petitioner is barred under principles of comity and issue preclusion from re-litigating the child's habitual residence because she previously, and unsuccessfully, sought identical relief in Austria.

Alternatively, if not barred from re-litigating the issue, the court finds that Petitioner has not proven by a preponderance of the evidence that Germany was the child's habitual residence immediately prior to her alleged wrongful removal and retention and therefore her petition fails on the merits. Rather, the evidence establishes that immediately prior to the claimed wrongful removal and retention, the child's habitual place of residence was Largo, Florida.

## Discussion

This case presents two fundamental issues. First, may a parent who unsuccessfully brought a Hague Convention petition in a foreign country prosecute a second Hague Convention action in the United States, after dismissing her appeal from the adverse ruling in the foreign country? Second, if the parent is not barred from prosecuting a second Hague Convention action, has the Petitioner demonstrated that a settled intent existed between the parents to move the child from the United States to Germany, such that her habitual residence immediately before Respondent took her to Austria and retained her there was in Germany?

As for the first issue, Respondent contends that Petitioner should be barred from prosecuting the instant petition  because she unsuccessfully sought the same relief in Austria and effectively waived her claims by dismissing her appeal of the unfavorable Austrian court order. Petitioner counters that the dismissal of the Austrian appeal does not foreclose a second Hague Convention

-2-

filing because the dismissal rendered the underlying order a nullity under Austrian law and that in any event, Respondent and his counsel perpetrated a fraud on the Austrian court, rendering those proceedings unfair.[2]

As for the second issue, Petitioner contends that she and Respondent always intended to move the child to Germany once she became of school age, that Respondent agreed to the move, made arrangements in Germany for her and the child, and flew her and the child to Orlando for their connection to Germany.   Petitioner contends that the child became acclimated to Germany. Respondent counters that he never consented to a permanent relocation of the child to Germany, believed that the move to Germany was a temporary separation resulting from marital issues between the parties, and that Petitioner misled him as to her intentions.

The events which precipitated the child's move from the United States to Germany and the email exchanges between the parties discussing Petitioner's reasons for the move and Respondent's desire for the family to reunite in the United States are determinative of whether the parties shared a settled intent to move the child to Germany. Those events demonstrate that the parties did not share a settled intent to permanently move the child to Germany. Nor has Petitioner proven by a preponderance of the evidence that the child was acclimated to Germany at the time of her removal to and retention in Austria.

---

[2]  In the May 4, 2010 order, the Austrian judge states that on April 21, 2010 "the mother filed a petition according to the Hague Convention on Child Abduction, acting [pro] se in court claiming that the father was unlawfully retaining the [child]." (Dkt. 43-6 at 6).  That petition is not in the record.  To the extent Petitioner has argued that she did not request a repatriation order under the Hague Convention from the Austrian court but merely requested enforcement of a German family court temporary custody order, she has not proven that contention and the Austrian order expressly refutes that contention. Indeed, she acknowledged in her testimony that she signed a Hague petition which, according to her, was prepared by the Austrian judge.

### The Hague Convention

Under the Hague Convention, as implemented by ICARA, when a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 provides that the latter state "shall order the return of the child forthwith." Hague Convention, art. 12. The Hague Convention "was enacted to 'secure the prompt return of children wrongfully removed to or retained in any Contracting State' and to 'ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (quoting Hague Convention art. 1). "The Hague Convention is intended to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998) (citation omitted).

Under ICARA, a parent may petition a court exercising jurisdiction in the locale in which a child is located for the child's return to the child's habitual residence in another signatory country. 42 U.S.C. § 11603(b). Article 16 provides that "until it has been determined that the child is not to be returned under this Convention," the judicial or administrative authorities of a signatory state "shall not decide on the merits of rights of custody." "The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Ruiz*, 392 F.3d at 1250 (citing 42 U.S.C. § 11601(b)(4); *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010).

The party seeking relief under Section 11603(b) must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Hague

-4-

Convention. 42 U.S.C. § 11603(e)(1).[3] Article 3 defines a removal or retention as "wrongful" when:

> a. it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

In this case, Petitioner must demonstrate by a preponderance of the evidence that: (1) the parties' child was "habitually resident" in Germany at the time Respondent removed the child; (2) the removal constituted a breach of Petitioner's custody rights under German law; and (3) Petitioner was exercising her custody rights at the time of the retention or removal, or would have exercised them but for the wrongful retention and removal. Hague Convention, art. 3; *Ruiz*, 392 F.3d at 1251. If Petitioner meets this burden, the child must be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." *Lops*, 140 F.3d at 936 (quoting 42 U.S.C. § 11601(a) (4)). Defenses must be proven by clear and convincing evidence. *See* Hague Convention, art. 13(b) and art. 20; 42 U.S.C. § 11603(e)(2)(A).

Neither the Hague Convention nor ICARA defines "habitually resident." "The inquiry into a child's habitual residence is a fact-intensive determination that cannot be reduced to a

---

[3] Section 11603(e) provides, in pertinent part:
Burdens of proof

(1) A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence–
(A) in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; . . .

predetermined formula and necessarily varies with the circumstances of each case." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006) (citing *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir. 2004)). Although the inquiry is highly fact-specific, "[f]ederal courts have developed a two-part framework to assist in the habitual residence analysis." *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009).

**Shared settled intent**

The first question is "whether the parents shared a settled intention to abandon the former country of residence." *Id.*; *see also Ruiz*, 392 F.3d at 1252, *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2001); *Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005). "It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary." *Ruiz,* 392 F.3d at 1252 (citing *Mozes*, 239 F.3d 1067 at 1075). "[T]here can be a change in the habitual residence of a child when the parents have a settled purpose in moving the child even for a limited period of time." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 272 (3d Cir. 2007) (citation omitted).

On the other hand, and relevant to this case, courts have generally refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis. *See Ruiz*, 392 F.3d at 1254; *Papakosmas v. Papakosmas*, 483 F.3d 617, 625-26 (9th Cir. 2007); *Gitter*, 396 F.3d at 135. Further, "[i]n cases where there is a dispute regarding a child's habitual residence, 'the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence.'" *Maxwell*, 588 F.3d at 252 (quoting *Gitter*, 396 F.3d at 135). Here, as will be explained, this court does not accept the testimony of either party at face value. Rather, it had to be ascertained from all of the relevant circumstances

whether they shared a settled intent to move their child to Germany and establish Germany as the child's residence.

Relevant considerations bearing on the parties' intent include "parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Maxwell*, 588 F.3d at 252 (footnotes omitted).

Although Petitioner presented her case in a manner consistent with these considerations, she ultimately failed to prove by a preponderance of the evidence that she and Respondent shared a settled intent to establish Germany as the child's permanent residence. To the contrary, the evidence demonstrates that the move to Germany was considered by Respondent as a trial separation of the parties consistent with the parties' amicable discussions, that he thought Petitioner and the child would return to the United States after Petitioner sorted through her "issues," and that he never consented or intended that the child would remain in Germany.

**Assimilation**

The second question considered in determining habitual residence is "whether there was 'an actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment.'" *Maxwell*, 588 F.3d at 251 (internal quotation marks and citation omitted); *see also Ruiz,* 392 F.3d at 1253 (the acquisition of a new place of habitual residence requires "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized.") (citing *Mozes*, 239 F.3d at

-7-

1078).

Absent shared parental intent, however, courts are "slow to infer" merely from a child's contacts with a new country the abandonment of an earlier habitual residence. *Mozes*, 239 F.3d at 1079.[4] Giving particular weight to shared parental intent or the lack thereof minimizes the incentives for unilateral action on the part of either parent, *Mozes*, 239 F.3d at 1079, and takes into account that "[c]hildren . . . normally lack the material and psychological wherewithal to decide where they will reside," *id.* at 1076.

Even where there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, however, a court may find a change in habitual residence "if the objective facts point unequivocally to a new habitual residence, or if the court could 'say with confidence that the child's relative attachments to the two countries have changed to the point where requiring a return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed.'"); *Ruiz*, 392 F.3d at 1254 (citing *Mozes*, 239 F.3d at 1081).

In assessing the child's acclimatization to a new country of residence, the question "is not simply whether the child's life in the new country shows some minimal degree of settled purpose," but whether the "child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Mozes*, 239 F.3d at 1081 (internal quotations and

---

[4] *See also Karkkainen*, 445 F.3d 280 at 297 (characterizing *Mozes* as having "established a presumption that shared parental intent (or lack thereof) regarding a change in habitual residence generally *trumps* evidence of acclimatization"); *Gitter*, 396 F.3d at 134 (only in "relatively rare circumstances" would evidence of acclimatization outweigh parental intent). Parental intent is even more important in the vase of very young children. *See Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004) (in the case of a very young child, "acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence.").

citations omitted); *see also Karkkainen*, 445 F.3d at 292 ("We examine a child's conduct and experiences to determine whether she became 'firmly rooted' in her new surroundings . . . ." (quoting *Holder v. Holder*, 392 F.3d 1009, 1019 (9th Cir. 2004)). Finally, in assessing the extent of a child's acclimatization, considerations include "school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age." *Maxwell*, 588 F.3d at 255 (footnotes omitted); *see also Ruiz*, 392 F.3d at 1255 (school attendance, social engagements, and lessons were evidence of acclimatization).

### The facts

The parties were married in Key West in 2006. Petitioner is a citizen of Germany. Respondent has dual citizenship in the United States and Austria. Their minor daughter was born on April 6, 2006 in Germany and has dual citizenship in the United States and Germany. (Petitioner's Exhibit 31). She was baptized in Germany during the parties' wedding celebration. The parties registered their child in Germany for monthly benefits and insurance (Petitioner's Exhs. 23, 25, 26, 57). Notwithstanding, it is undisputed that since the age of five weeks, the child resided with her parents in Largo, Florida until November 25, 2009, when Petitioner took her to Germany.

The parties have significant familial and business contacts in Germany. Petitioner's family lives there and Respondent's family lives in Austria. The parties traveled to Germany and Austria regularly to visit family and conduct their business, Florida Race Connections, Inc., shipping 25 to 30 cars from the United States to Europe every year. Petitioner maintains an apartment in Vellberg, Germany in a building her parents own, maintains a savings account there, and uses funds deposited into that account when she is in Germany. The child's government checks are deposited into that account. Petitioner made plans to complete her health practitioner training there, enrolled in a

correspondence course, and attended seminars in Germany (Petitioner's Exh. 59).

Notwithstanding, it is undisputed that Respondent and Petitioner have been continuous residents of Largo, Florida for several years. Respondent has lived in Pinellas County since 1990, where he is employed as a private pilot. Petitioner has lived with Respondent in his home in Largo since 2002. As noted, the child lived there essentially her entire life.

Because of their business and family connections to Germany, there is no doubt that the parties discussed returning to Germany at various times during their marriage. The *relevant* discussions began, however, as early as 2008 when the parties began to experience marital problems, resulting in part from Petitioner spending substantial time in Germany. The marital conflict peaked in May, 2008, when Respondent "showed her the door" and told Petitioner she should leave if she was unhappy. The parties apparently tried to work through their problems but in the fall of 2009, Respondent began to suspect that Petitioner had become involved with another man in Germany.

Eventually, Petitioner confessed that she had met someone else in Germany. They began discussing a separation. The parties had planned to travel to Germany in December, but Petitioner wanted to leave earlier to attend an art show in Munich. In light of these planned activities, the parties began making preparations for Petitioner and the child to travel to Germany.

The testimony of the parties concerning their intentions was predictably in conflict. Although both parties were less than credible with respect to some aspects of their respective testimony, the court finds that Petitioner's testimony was less credible than Respondent's with respect to the events relevant to whether there was a shared settled intent to permanently move the child to Germany. Some of her testimony was simply too convenient and self serving to be believable, was clearly tailored to support her legal theories, and overall was not convincing.

For example, Petitioner maintained that she and Respondent had always intended to move the child to Germany when she became of school age. The evidence was undisputed, however, that in 2008, Petitioner filled out the child's enrollment at Anona Christian Pre-School in Largo (Respondent's Exh. 35) and the child attended there from January, 2009 until November, 2009, when Petitioner took her to Germany. (Respondent's Exhs. 1, 35).[5] Significantly, the parties registered the child for the Fall 2009 term and prepaid the tuition, something reasonable persons would not ordinarily do if they intended to move the child to Germany in order for her to attend German schools. Indeed, after Respondent learned from Petitioner that she was not returning with the child to the United States, Respondent wrote to the school on January 25, 2010, requesting a refund for December, 2009 and January, 2010, because his wife had taken the child to Germany without his consent (Respondent's Exh. 35, p. 000343).

According to Petitioner, in anticipation of living in Germany, Respondent shipped a Ford Mustang there in October, 2009 for her to use. (Petitioner's Exh. 19). She testified that in September, 2009, consistent with their plan to move to Germany, the parties purchased investment property in Germany, agreeing to place title in her name to avoid having to pay taxes in Germany, and that Respondent wired $30,000 (Euros) on November 19, 2009 from his Austrian bank account for the closing costs. (Petitioner's Exh. 52). Although Petitioner acknowledged that Respondent was upset at the time because she had an interest in someone else, she explained that he agreed to wire the funds because he owed her $72,000, as evidenced by two promissory notes (Petitioner's Exh. 60). Petitioner testified that Respondent watched her pack, was aware that she used his credit card to

---

[5] Testimony from Petitioner's witnesses that Respondent expressed the intent of enrolling the child in preferable German schools was not credible, as they exhibited obvious bias in favor of Petitioner.

purchase one-way tickets to Germany, and flew them to Orlando to make their connection, even attempting to arrange an upgrade for them.

Petitioner acknowledged that she had her mother register the child in kindergarten in Germany in October, 2009 and that consistent with that arrangement, the child started school in Germany on December 1, 2009. According to Petitioner and her mother, Respondent overheard her conversation with her mother about the cost of the school, expressed surprise that it was less expensive than private school in Florida, and agreed to the child's enrollment in Germany.

Respondent acknowledged Petitioner had approached him to enroll in an on-line health practitioner class but was not aware that she had actually enrolled. He explained that they decided to purchase the three-unit rental property in Germany as an investment, not because they were moving there. He acknowledges wiring money for the closing but maintains it had nothing to do with the promissory notes he executed in favor of his wife.

Respondent credibly denied that the parties had always intended to move to Germany. The evidence supports Respondent's denial. Respondent was a longtime Florida resident. The parties filed joint tax returns in the United States in 2006, 2007, 2008 and 2009, listing their daughter as a dependent (Respondent's Exh. 36). Respondent's residence qualified for Florida's homestead tax exemption (Respondent's Exh. 33). He maintained health insurance for the family with Blue Cross Blue Shield (Respondent's Exh. 48). Petitioner posted her residence as "Tampa, Florida" on her Facebook page (Respondent's Exh. 47). Petitioner had been a permanent resident of the United States since June 19, 2002 (Respondent's Exh. 41). She had a credit card with Bank of America (Respondent's Exh. 38). Petitioner was a 25% owner of Florida Race Connection, Inc. and helped keep the books for the company. (Respondent's Exh. 39, p. 000553). In sum, all indications are that

-12-

the parties were and intended to be permanent residents of Largo, Florida, where Respondent was employed as a private pilot, they operated a moderately successful automobile export business, paid taxes, and raised their child.

With respect to the Mustang, Respondent explained that he and a partner purchased three Mustangs for re-sale in Germany. He and Petitioner had discussed this and he put the title of one of the Mustangs in her name because she had a friend in Germany who was going to help with the European conversion. He explained that he shipped his Mercedes to Europe in 2008 for leisure use, and that he maintained insurance on the car in Florida (Respondent's Exh. 34).

According to Respondent, he viewed the trip to Germany as a temporary separation. When it came time for Petitioner and the child to travel to Germany, Respondent tried to convince her to stay through Thanksgiving, to no avail. Respondent acknowledged seeing Petitioner pack clothes for the trip but says he saw her packing only winter clothes and art frames, consistent with the expected short winter stay in Germany and her participation in the Munich art show.[6] Petitioner did not tell him she was packing their daughter's personal belongings. Respondent maintained, somewhat less credibly, that he was unaware that Petitioner had purchased one-way tickets for herself and their child.

Regardless, the court finds that Respondent did not consent to a permanent move of the child to Germany. He acknowledges facilitating Petitioner's move to Germany with the child but credibly maintains that he believed it was only a temporary separation, and that he and Petitioner would reconcile after her "crisis" subsided. Similarly, the friends of the parties who testified, as well as the

---

[6] Respondent's testimony is supported by the October, 2010 photographs he took of Petitioner's closet and bathroom vanity, as well as the child's room (Respondent's Exh. 32). The rooms and vanity reflect many personal items, clothing and toys, consistent with a return to the residence.

-13-

parties' housekeeper, saw no indication that Petitioner planned to permanently relocate to Germany.

It is apparent that Respondent assisted Petitioner with the move in hopes of saving his marriage, believing all the while that she and the child would return to the United States. He knew he would see them in December as planned, and hoped that Petitioner would have a change of heart and reconcile. That hope of a reconciliation was fueled in part by the events of the last evening they spent together in Florida.

On November 24, 2009, the night before Petitioner left for Germany, the parties had dinner at a favorite restaurant and watched the sunset. According to Respondent's testimony, not challenged by Petitioner, Petitioner told him she loved him and felt closer to him than ever before. Notwithstanding, it is apparent and the court so finds, that Petitioner was already considering leaving Respondent by this time. Without his knowledge, she had made arrangements to enroll the child in school in Germany through her mother and had developed a relationship with another man in Germany. It is apparent that she intended to remain in Germany with their child.

Other circumstances demonstrate the lack of a shared settled intent to move the child to Germany. In mid-November, 2009, suspecting that his wife had ulterior motives for returning to Germany, Respondent sought the advice of his friend and employer, Attorney Wil Florin. According to Florin, Respondent had discovered that Petitioner had a romantic relationship with another man in Germany, was very concerned about Petitioner attending the art show in Munich, and pondered whether to take a stand about her going. Respondent told Florin the family had plans to travel to Germany in December, but the question was whether Petitioner should leave early. Significant to the issue of shared settled intent, Florin testified that there was no indication from Respondent that Petitioner and the child were actually moving to Germany and all indications were that they would

-14-

remain residents of Largo.

On the Saturday after Petitioner and the child left for Germany, Respondent called their housekeeper, Maria Oliver, to talk. They met the next day. Respondent told her he was aware of his wife's new friend and was hoping she would change her mind and come back, and that he was ready to forgive her. Oliver described Respondent as "very sad, depressed."

After Petitioner and the child traveled to Germany, the parties remained in regular contact via email. A ski trip to Austria was planned for December 26. On December 20, 2009, Respondent surprised Petitioner by showing up at her apartment in Vellberg. She was there with her new male friend and the child. In his words, he was "devastated." Up until this point, he had always hoped she would "snap out of it" and come back to him. However, according to Petitioner, she never had plans to return to the United States.

They agreed that Respondent would take the child on the planned ski trip to Austria. She and her boyfriend drove the child to Respondent's hotel in Austria and dropped her off. However, the child became ill and the trip was cut short. According to Petitioner, Respondent accepted the situation and calmly told her: "Let's move on, life's too short." Respondent returned to the United States on January 2, 2010.

After Respondent returned to the United States, he pleaded with Petitioner to return to the United States. He did not learn of her true intentions until January 20, 2010, when she informed him by email that she was not returning (Respondent's Exh. 42).

The emails exchanged between the parties in January, 2010 demonstrate that Petitioner's permanent move to Germany was unilateral on her part, contrary to her testimony. It is apparent from her own words that she was motivated by her career objectives and the new gentleman in her

life, not by an agreement with Respondent to move the child to Germany.  Those emails further demonstrate Respondent's earnest efforts to persuade Petitioner to return to the United States with the child, indicative of his lack of consent to Petitioner's move to Germany with the child:

> p. 000131 (Respondent): "PLEASE RETURN HOME A.S.A.P. I CAN HARDLY WAIT FOR THE TWO OF YOU";

> p. 000132 (Petitioner): "YOU HAVE ALWAYS THOUGHT OF GOING BACK TO EUROPE BECAUSE OF FAMILIES, AND **NOW THAT I HAVE MADE THIS DECISION** IT IS UNIMAGINABLE FOR YOU TO GO BACK TO AUSTRIA AND THE COLD, TOO BAD." (*emphasis added*) . . . "I UNDERSTAND PERFECTLY THAT YOU WANT TO HAVE [the child] BACK HOME AND I AM POSITIVE THAT WE WILL FIND A SOLUTION IN THE FUTURE, THAT YOU WILL ALSO BE ABLE TO SPEND ENOUGH TIME WITH HER AS WELL";

> p. 000130 (Petitioner): "*the reason that I left you in November* was not only because of the purchase of the investment property (house) but mainly because I wanted to find out for myself as to where my feelings stand. I did that and it became very clear to me that under the circumstances our relationship cannot last. I respekt [sic] you and like you as a human and we have had truly wonderfull [sic] years together and most importantly you are the father of our child" (emphasis added).

> P. 000703 (Respondent): "I WISH FOR YOU TO COME BACK WITH HER A.S.A.P. OR AT LEAST THAT I CAN GO AND GET HER BACK HOME . . .  I HAVE WROTE YOU IN THIS MATTER ALREADY WEEKS AGO HOWEVER WITH NO RESPONSE FROM YOU. PLEASE ADVISE URGENTLY."

After receiving Petitioner's January 20, 2010 email, Respondent engaged counsel to assist him in returning the child to the United States. Pursuant to his attorney's instruction, Respondent searched the marital residence for evidence confirming the child's residence there. He found that Petitioner had taken virtually all of the child's papers. On February 8, 2010, Respondent filed for dissolution of marriage in Pinellas County, executing the petition and the required Uniform Child Custody Jurisdiction and Enforcement Act Affidavit on the same date (Respondent's Exhs. 2, 3). On February 18, 2010, Petitioner executed an Application for Assistance Under the Hague

Convention on International Child Abduction, which his attorney held in trust if needed (Respondent's Exh. 4). On February 24, 2010, he filed an Ex Parte Motion for Article 15 Declaration of habitual residence of the child in his dissolution of marriage case (Respondent's Exh. 31). Respondent's counsel unsuccessfully sought expedited service of the dissolution petition on Petitioner in Germany, including service of Respondent's Application for Assistance Under the Hague Convention on International Child Abduction (Respondent's Exh. 5, 26).

At about this time, Respondent again sought the counsel of Attorney Florin. Florin recalls that Respondent was concerned that Petitioner would not return to the United States. He told Florin that he had filed for divorce and for relief under the Hague Convention to have the child returned. Florin recalled that Respondent described trying to locate documents proving that the child's residence was in Florida but having discovered that all of the documents he expected to find were missing. Respondent surmised to Florin that in hindsight, he thought the crates Petitioner had packed were heavier than expected and he believed she surreptitiously packed most of her personal belongings. Respondent told Florin that he wanted to bring the child back quickly without Petitioner's knowledge. The significance of this conversation, apart from the inappropriate intention of Respondent, is that it reflects a lack of consent on Respondent's part for the child to remain in Germany. Additionally, Florin's recollection of the conversation corroborates Respondent's testimony.

What transpired over the next few months was nothing short of desperate attempts by both parties to obtain custody of the child. First, there is evidence of procedural posturing and forum shopping on the part of Petitioner, resulting in a somewhat confusing series of Austrian and German

-17-

court applications and orders.[7]  Second,  Respondent returned to the United States with the child

_____

[7] *The Additional German Family Court Proceedings*

This court has attempted to follow what transpired procedurally in the German courts after Petitioner obtained the ex parte custody order on April 20, 2010 (Respondent's Exhibit 6). Respondent has submitted the affidavit of a German attorney (Niethammer-Jurgens) who specializes in German family law, who explains and summarizes the proceedings in Germany (Respondent's Exh. 46). That summary is likely more accurate than this court's.

Petitioner's expert has summarized the issues and some of the proceedings as well (Petitioner's Exhs. 51, 62). That report, however, purports to opine on the ultimate facts to be determined by this court as the trier of fact. Further, the report demonstrates a partisan slant, rather than an unbiased explanation of the foreign court proceedings. To the extent either of these experts purport to opine on the ultimate facts or state legal conclusions on the habitual residence of the child, those opinions are rejected as intrusive of this court's responsibility to determine the facts, including the child's habitual residence immediately prior to her alleged wrongful removal and retention in Austria.

On the other hand, an informed explanation of the German proceedings by an attorney (Niethammer-Jurgens) familiar with them is helpful. For example, it is apparent, as confirmed by Niethammer-Jurgens, that "the Higher Regional Court of Stuttgart, has decided three times that (child) did not have her habitual residence, according to the HKU [Hague Convention of Child Abduction], in Vellberg/Germany before her return to Florida . . . ." (Respondent's Exh. 46, p. 5). A review of the Stuttgart court's orders confirms this observation.

Although it ultimately has little bearing on the merits, Petitioner's sojourn through the Austrian and German judicial systems does reflect a troubling pattern of procedural posturing, whose argument that the child's usual place of residence was Vellberg, Germany was repeatedly rejected by the German courts, as it was by the Austrian court.

On April 21, 2010, Petitioner filed for relief pursuant to the Hague Convention in Austria. The Austrian court conducted a hearing on April 23, 2010 and deferred ruling.  Respondent returned to the United States with the child on April 28, 2010.

After Respondent returned to the United States with the child, and notwithstanding that the Austrian court had not yet ruled on her Hague petition, Petitioner returned to the German courts, filing a series of petitions and appeals. First, she filed a second Hague petition with the German authority on April 29, 2010, which was transmitted to the U.S. Central Authority and ultimately filed in this court.

On the same day, Petitioner sought an Article 15 declaration under the Hague Convention from the German family court that Respondent illegally abducted the child when he returned to the United States with the child (Dkt. 9). That petition was dismissed on May 4, 2010 (Respondent's Exh. 21), coincidentally the same day the Austrian court denied Petitioner's Hague petition.

Petitioner unsuccessfully appealed to the State Appellate Court at Stuttgart. Significantly, in its May 28, 2010 decision, that court, noting that the child had only resided in Germany from November, 2009 to April, 2010, essentially determined that Petitioner had not and likely could not establish that the child's customary place of residence was Germany  (Respondent's Exhibit 9, p. 4).  The court also noted that Petitioner's decision to take up residence in Germany was not sufficient, since she had provided no evidence that she possessed sole custody rights over the child.

Petitioner's appeal of that decision to the German Provincial Supreme Court in Stuttgart was likewise denied (Respondent's Exhibit 12). That court determined that Petitioner's supplemental evidence did not establish that the child's habitual residence was Germany, stating that "the fact that [Petitioner] remained in Germany with the child for an extended period of time each year does not change the fact that the child's actual residence is essentially the USA, where [the child] also attended pre-school.  The periods of residence in Germany [described in Petitioner's supplemental submission], therefore, are considered on visitation basis only and did not have an initial effect on the child's actual residence."

Undeterred, on June 2, 2010, Petitioner initiated a criminal complaint against Respondent with the German Chief Prosecutor. The Chief Prosecutor declined to prosecute (Respondent's Exh. 16, 45).

On June 15, 2010, Petitioner filed a second petition in the District Court of Schwabisch Hall seeking an

without notice to Petitioner or the Austrian court, which had conducted a hearing on Petitioner's Hague Convention petition and had the matter under advisement.

Ultimately, Petitioner's multiple applications in the German courts gained her no relief. Moreover, she abandoned and thereby waived her claims in the Austrian court by dismissing her appeal from the adverse Hague Convention ruling.

*Respondent's alleged wrongful removal of the child to Austria and retention there*

The parties agreed that Respondent would take the child to Austria for the 2010 Easter holiday. However, when Respondent arrived in Germany on March 23, his intention was to return the child to the United States. Pursuant to their earlier discussion, he and the child flew to Austria. There, he registered the child and obtained an Austrian passport for her without Petitioner's knowledge. According to Petitioner, he was to return the child on April 12, 2010. Petitioner became concerned when Respondent told her his plans had changed and would not give her a return date. Petitioner traveled to Vienna to locate the child but was unable to locate the child or Respondent. She faxed papers to the German court seeking assistance in having the child returned to Germany.

---

Article 15 declaration under the Hague, contending that Respondent's retention of the child on Austria was wrongful under the Hague. That court dismissed the petition on July 9, 2010, finding that the relief sought by Petitioner "has already been decided" in the May 28, 2010 decision of the appellate court in Stuttgart (Respondent's Exh. 14).

Petitioner's appeal of that order was dismissed on October 25, 2010 by the Higher Court of Stuttgart. According to Niethammer-Jurgens, that court referred to and quoted its October 21, 2010 order, which had vacated a second temporary custody order Petitioner had obtained (Respondent's Exh. 24).

As to the reference to the Stuttgart court's October 21, 2010 order, Petitioner had obtained a second temporary custody order from the District Court - Family Court Schwabisch Hall on August 25, 2010 (Respondent's Exh. 17). Respondent appealed that order to the Provincial Supreme Court Stuttgart. On October 21, 2010, that court vacated the temporary custody order, denying Petitioner the right to determine the child's place of residence. (Respondent's Exh. 24). The court expressly rejected Petitioner's argument that the child was a resident of Vellberg, Germany "when the father travelled to the USA with her." (*Id.* at p. 3). The court reasoned that "[a] regular place of residency did not occur just because by arrival in the Federal Republic of Germany with the mother." (*Id.* at p. 4). Significantly, the court referenced the email exchange between the parties in late 2009 and early 2010, specifically Petitioner's January 20, 2010 email to Respondent, and concluded from those exchanges that Petitioner did not have a settled intent to take up permanent residence in Germany until after she arrived. The court also took note of the pending Hague proceedings in this court.

In the meantime, the Florida Circuit Court had denied Respondent's ex parte motion for temporary injunction and Article 15 declaration of habitual residence, noting that he had not filed a Hague Convention case (Respondent's Exh. 28, March 25, 2010 order). On April 19, 2010, Petitioner obtained the first of two ex parte temporary custody orders from the German family court (Respondent's Exh. 6).[8] She presented the first order to the Austrian police and then to an Austrian judge. The Austrian court declined to recognize it but recommended that Petitioner seek relief under the Hague Convention, arranging for her to execute an application, which she did. The judge contacted Respondent, who agreed to attend a hearing on the petition.

### The Austrian Trial Court Proceedings and Hague Convention Order

On April 23, 2010, the Austrian court conducted a four-hour hearing on Petitioner's Hague Convention petition. Petitioner was represented by counsel. Respondent appeared *pro se.* Initially, the Austrian judge attempted to mediate the dispute. The court then conducted an evidentiary hearing during which both parties testified. At the conclusion of the hearing, the Austrian judge allowed Respondent to maintain custody of the child and apparently authorized visitation by Petitioner, as reflected in Petitioner's counsel's letter demanding visitation in accordance with the judge's order (Respondent's Exh. 52).

Respondent, because of what he described as erratic conduct by Petitioner concerning visitation, became concerned that Petitioner actually intended to take the child back to Germany. He flew with the child to the United States on April 28 without informing Petitioner or the Austrian

---

[8] As noted in the summary of German judicial proceedings in note 7, *supra*, the ex parte temporary custody orders Petitioner obtained were ultimately vacated by the German appellate courts.

judge until after he arrived in the United States.[9] On April 29, Petitioner filed a Hague Convention petition with the German Central Authority, which was transmitted to the U.S. Central Authority on May 19, 2010, resulting in the instant petition.

On May 4, 2010, the Austrian judge issued her order denying Petitioner's Hague petition on the merits (Respondent's Exh. 7). The judge summarized the events leading up to Respondent's retention of the child in Austria, including Petitioner's contentions under the Hague Convention. The judge discussed the circumstances under which Petitioner brought the child to Germany and the facts relevant to a determination of habitual residence under the Hague Convention, noting that Respondent had returned to the United States with the child. Significantly, the Austrian judge found, with respect to Respondent's expectation that Petitioner and the child would return to the United States:

> From the available E-mail . . . it is clear, that the child's father up to this time wished to ignore the situation and get back to business as usual. This is proof, that the child's father at least until Jan. 20, 2010 thereby reckoned that the child's mother was coming back to Florida.

Respondent's Exh. 7, p. 4.

The judge found that the child's residence in Germany was "too short" to be considered her usual residence and recognized that even if the child were to be repatriated to Germany, "the German authorities would have to decide the repatriation to America." *Id.* at p. 5. Specifically, the Austrian judge determined that Respondent had not agreed to the child's relocation to Germany and that she had not been in Germany long enough to be considered a habitual resident there within the meaning

---

[9] As will be discussed, Respondent's unilateral conduct does not prevent the denial of Petitioner's petition, because Florida remained the child's habitual residence. These facts distinguish this case from *Karpenko v. Leendertz*, 619 F.3d 259 (3d Cir. 2010).

of the Hague Convention.

Petitioner appealed. Through her attorney, she fully briefed her claimed errors (Dkt. 35-2; Respondent's Exh. 23). Notwithstanding, on September 2, 2010, through counsel, Petitioner dismissed the appeal pursuant to an Austrian rule of procedure providing that the withdrawal constituted a waiver of the underlying claim. Under Austrian law: "If an appeal has been lodged against a decision of a first instance court, the petition can be only withdrawn by the petitioner under waiver of claims." (Respondent's Ehx. 25; Art. 11 para. 1, Austrian Act of non-contentious proceedings ("AuBStrG")). Further, if a claim has been waived by withdrawing a petition, "a further petition on the same claim is not admissible." (Id., Art. 11, para. 3, AuBStrG). Accordingly, the Austrian appellate court declared the underlying trial court decision to be without legal effect but noted that the dismissal effected a waiver of all claims by Petitioner (Respondent's Exh. 20).

### Successive Hague Convention actions

The novel issue presented in this Hague Convention action is whether a parent who previously sought and obtained an unfavorable determination of habitual residence of her minor child in a foreign court, after a full and fair evidentiary hearing, may obtain a second determination from this court. After careful consideration, I find that she may not. A second Hague proceeding would undermine two important goals of the Hague Convention, avoiding (1) needless judicial proceedings involving children and (2) potentially conflicting judicial decisions involving international child custody disputes. The availability of a second proceeding would provide an incentive to parents seeking a more favorable forum and would expose the child and the parents to

needless judicial proceedings, contrary to an efficient and orderly determination of the issues.[10]

Initially, it troubles the court that a party may, like Petitioner, initiate a Hague action in one country, receive an adverse ruling, dismiss the petition and file another petition in another country. Reason and the purpose of the Hague Convention suggest that she should not be able to do so. The Hague Convention is intended "to restore the status quo ante and to deter parents from crossing international boundaries in search of a more sympathetic court." *Silverman v. Silverman*, 267 F.3d 788, 791-92 (8th Cir. 2001) (quoting *Rydder v. Rydder*, 49 F.3d 369, 372-73 (8th Cir. 1995)); *see also Lops*, 140 F.3d at 936; *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996); *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997) (Convention's intent is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States" and "to remove forever the incentive for a parent to flee across borders to obtain a favorable ruling.") (citing Letter of Transmittal from President Ronald Reagan (Oct. 30, 1985), *reprinted in* 51 Fed. Reg. 10494, 10,495 (1986); Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986)).

## Comity

After considering the testimony and argument bearing on whether the Austrian proceeding was fundamentally fair to both parties, and finding that it was, I find that Petitioner may not re-

---

[10] Because of the uncertain effect of Petitioner's dismissal of her Austrian appeal on her right to file a second Hague Convention petition, and the important consideration of whether to accord the Austrian court's order comity under international law, this court declined to resolve this issue on Respondent's motion to dismiss (Dkt. 46). There is, however, authority supporting that manner of addressing the issue. *See Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997) ("Failing to grant the motion to dismiss also could create a new incentive for parents to flee Hague Convention proceedings in the hope of obtaining a second, more favorable Convention determination in another country."), *cert. denied*, 522 U.S. 1052 (1998); *Navani v. Shahani*, 496 F.3d 1121, 1130 (10th Cir. 2007), *cert denied*, 552 U.S. 1182 (2008).

litigate the child's habitual place of residence immediately prior to her removal and retention in Austria by Respondent. But for the dismissal of the appeal, the Austrian court's order would be entitled to deference under principles of comity as a final judgment. Notwithstanding, issue preclusion and waiver bars Petitioner from re-litigating the child's habitual place of residence.

As has been said, "comity is at the heart of the [Hague] Convention." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001) (citation and internal quotation marks omitted); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1011 (9th Cir. 2009) (citing *Diorinou*, 237 F.3d at 142) . Because the Austrian court examined each element of Petitioner's burden under the Hague Convention, its findings should be accorded deference under principles of comity. *Velez v. Mitsak*, 89 S.W. 3d 73, 84 (Tex. App. 2002) (discussing in context of whether to accord deference to Italian Hague judgment, where it was challenged on due process grounds and fraud); *Diorinou,* 237 F.3d at 139-40 (recognizing that United States courts not obliged to recognize judgments rendered by a foreign state but may choose to give res judicata effect to foreign judgments on the basis of comity).

That the judge may have misunderstood the status of Respondent's filings in the Pinellas County dissolution case, including the Article 15 request, does not render the Austrian judicial proceeding unreliable or unfair. There was no fraud perpetrated on that court by Respondent or counsel. Indeed, Respondent signed the Article 15 request on February 18, 2010, two months before the unexpected Austrian court proceeding. It is apparent that the Austrian judge considered the documents signed by Respondent only on the issue of whether he had consented to the child's move to Germany, and whether under the Hague Convention the parties had a settled intent to permanently relocate the child there. That Respondent sought legal counsel and executed the Article 15 request was probative of whether he consented to Petitioner's decision to move the child to Germany.

-24-

In determining whether to accord deference to a foreign court's findings, an 1895 Supreme Court decision is instructive:

> [W]e are satisfied that where there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact. The defendants, therefore, cannot be permitted, upon that general ground, to contest the validity or the effect of the judgment sued on.

*Hilton v. Guyot*, 159 U.S. 113, 202-203 (1895).

Although a transcript of the Austrian proceeding is not available, it is undisputed that both parties were present and participated in the hearing, as evidenced by the Austrian judge's reference to the statements of both parties. (Petitioner's Exh. 16; Respondent's Exh. 7).[11] The Austrian judge was, as demonstrated by her well-reasoned decision, fully apprised of the conduct of each parent relative to the removal of the child from the United States to Germany and then to Austria. That court decided the very issue Petitioner presents to this court, the child's habitual residence immediately preceding her removal from Germany to Austria and then to the United States.

Although Petitioner complains that the Austrian proceeding was not full and fair, she points to nothing in the Austrian judicial process which supports a conclusion that the process was not conducted in accordance with the Hague Convention. To the extent Petitioner complains of the

---

[11] The parties introduced two translated versions of the Austrian court's order. Petitioner's version contained a glaring error. Accordingly, the court accepts Respondent's translated version, although noting there are no material differences between the two, other than the obvious error in Petitioner's version.

evidentiary findings of the Austrian court, and its consideration of evidence which it may have misapprehended, those alleged errors do not undermine the full and fair process it afforded both parties, and the impartial administration of justice in that forum.

Apart from the procedural effect of the dismissal of her Austrian appeal by Petitioner, the fact remains that she was afforded a full and fair hearing on her Hague Convention petition in Austria and she should not have an opportunity to re-litigate the same issues in the United States. That she mistakenly thought that a better course would be to dismiss the appeal and re-file with the German authority and start anew is a matter of her own making. Neither does Respondent's unilateral decision to return the child to the United States mitigate in favor of a second hearing. Essentially, the evidence establishes that it was Petitioner, rather than Respondent, who effected a "wrongful" removal when she moved with the child to Germany.

**Fraud**

Petitioner contends that Respondent and his American attorney perpetrated a fraud on the Austrian court by submitting documents indicating that Respondent had filed a Hague proceeding incident to his Florida dissolution action and had obtained a declaration of habitual residence from that court.[12]

---

[12] A recurring argument of Petitioner is that Respondent perpetrated a fraud by representing to the Austrian court that he had filed a Hague Convention case in the United States, pointing out in addition that Respondent's Application for Assistance Under the Hague Convention faxed to the Austrian judge included a representation that the Florida court "has rendered an Article 15 Declaration of Habitual Residence and Wrongful Retention attached as Exhibit B." (Respondent's Exh. 4; Petitioner's Exh. 2).

On February 18, 2010, Respondent signed but did not submit a Hague Petition seeking the return of the child from Germany. His unfiled Hague Petition stated that (a) the child was a habitual resident of Florida since her birth; (b) Respondent was lawfully exercising custody under the laws of Florida at the relevant time; (c) Petitioner had wrongfully retained the child in Germany within the meaning of Article 3 of the Hague Convention; (d) "the U.S. Court in Florida has rendered an Article 15 Declaration of Habitual Residence and Wrongful Retention attached as Exhibit B"; and (e) "the father has initiated divorce proceedings in Pinellas County, Florida and received an Article 15 Declaration of Habitual Residence and Wrongful Retention attached as Exhibit B."

The two quoted statements were inaccurate because no court had rendered an Article 15 declaration of

Regardless of whether the papers had actually been filed as a Hague petition, it was undisputed that Respondent signed them, they were being held by his attorney, and they related to the Respondent's actual, albeit unsuccessful, attempts to have the Florida family law court issue an Article 15 habitual residence finding.[13] While the Austrian judge may have misapprehended the nature of the papers Respondent had actually filed in the Florida court, the fact remains that whatever was filed, and regardless of the Florida court's ruling, Respondent had taken affirmative steps in the Florida dissolution proceeding to regain custody of the parties' child by asserting the child's habitual residence to be in the United States immediately before Petitioner moved with her to Germany. These actions support the Austrian judge's finding that the father did not consent to the child's move to Germany.

In any event, Respondent credibly explained during this court's evidentiary hearing that these documents had been prepared by his attorney in anticipation of pursuing a Hague Convention

---

habitual residence or wrongful removal.  Accordingly, no Article 15 declaration could have been "attached as Exhibit B" to the unfiled Hague Petition. Petitioner's counsel had sought such an order, as he had filed with the Florida court an Ex Parte Motion for Article 15 declaration on February 24, 2010 and a supplemental motion on March 25,2010 (Dkt. 26-4). The Florida court denied the motion(s) on March 25, 2010 (respondent's Exh. 28).
    Incident to the Austrian proceedings, Respondent's Florida attorney faxed copies of what had been filed in Florida to the Austrian judge, as well as a copy of the "Application for Assistance Under the Hague Convention on International Child Abduction" signed by Respondent on February 18, 2010.  The Austrian judge actually conferred with the Florida Circuit judge at the request of Respondent's counsel (Respondent's Exh. 19). It is apparent, therefore, that the Austrian judge understood the procedural status of the Florida proceedings. It is likewise apparent that the judge intended to conduct a hearing on Petitioner's Hague petition, without regard to what had occurred in the Florida court, based on the judge's remarks to the Florida judge (Respondent's Exh. 19).
    There was no overt fraud perpetrated on the Austrian court.  That court was well aware, albeit mistaken, of the American and German proceedings and the nature of the pleadings which had been filed in Florida. In any event, as will be discussed, the Austrian judge's ruling was not premised on the nature of the Hague pleading filed by Respondent in Florida but on Respondent's demonstrated intent in trying to have his daughter returned by invocation of the Hague Convention. In other words, the existence or not of a filed Hague application was not determinative.

    [13] Article 15 of the Convention provides that the judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention.

proceeding, if necessary. It is undisputed that he signed the documents on February 18, 2010. It is apparent that Respondent's attorney filed the motion for an Article 15 declaration to support the unfiled Hague Application, which was intended to be filed, if necessary, in Germany along with the Article 15 declaration that he (too optimistically, as it turned out) expected the Pinellas County court would issue. The expectation that his motion would be granted explains the statement (albeit inaccurate at the time) in the unfiled Hague Petition that "the U.S. Court in Florida has rendered an Article 15 Declaration of Habitual Residence and Wrongful Retention attached as Exhibit B." Respondent credibly explained that he was merely trying to explain to the Austrian judge what he had done in the United States to secure his daughter's return.

To the extent, therefore, that Petitioner argues that the proceeding was unfair because of the claimed fraud perpetrated by Respondent, her argument does not mitigate against deference to the Austrian court's findings under principles of comity and the principles of issue preclusion and claims waiver. The presentation of false evidence does not prevent claim preclusion. See *Morton v. Morton* 982 F. Supp. 675, 689 (D. Neb. 1997) ("'Mere presentation of false evidence . . . does not generally warrant relief' from the claim preclusion rules.") (citing 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure § 4415, at 129 (1981)); Restatement of Judgments §§ 120-121, 126 (1942) (If the state of rendition follows the usual rule, only fraud that deprives the complainant of an opportunity to present adequately his claim or defense will provide a basis for equitable relief against the judgment.).

The analysis does not end there, however. After the Austrian court concluded its evidentiary hearing, but before it issued its written order, Respondent returned to the United States with the child. It is undisputed, as indicated in the Austrian court's decision, that both Petitioner and

Respondent notified the judge that Respondent had returned to the United States with the child. Notwithstanding, the Austrian court rendered its decision, apparently determining not to stay the proceeding and refer it to the United States courts, as it could have done pursuant to the Hague Convention.

**The dismissed Austrian appeal**

Regardless, after the Austrian court ruled, and with knowledge that Respondent had returned the child to the United States, Petitioner filed an appeal with the Austrian appellate court, fully briefing the errors she now contends rendered the Austrian judicial proceeding unfair. Significantly, she argued that Respondent's counsel had not faxed complete records from the Florida proceedings, including the order denying the motion for an Article 15 declaration of residency, and that the Austrian judge had been "deceived""

> As emerged from a search of the court files in the US after 5/20/10, additional, essential motions, that were admittedly also not decided or were rejected, were not sent along. To this extent, the Viennese court was skillfully deceived by incomplete records. The defendant was apparently not well-disposed to having it be manifested that his motion for dismissal [sic] of an Art. 15 certification of the Hague Child Abduction Convention was rejected by the US court (the Viennese decision mentions a motion by the father, and reproduces the father's presentation of the party's case that delivery problems may have occurred, etc.) This is of little help; it is, namely, wrong: . . .

Dkt. 35-2, p. 9, 12-15; Respondent's Exh. 23).

It is apparent, therefore, that Petitioner's brief argued the very point that she now presses, that Respondent misled and "deceived" the Austrian judge concerning what had occurred in the Florida court. Had she not dismissed appeal, she could have obtained appellate review of that contention from the Austrian appellate court.

Further, Petitioner's brief argued that the Austrian court erred in when it "re-interpreted the

motion to surrender the child as a repatriation motion according to the Hague convention," a

contention Petitioner unpersuasively advanced in her testimony before this court. She does not now

maintain, nor did she urge in her brief to the Austrian court, that her counsel objected to the manner

in which the Austrian judge proceeded. Moreover, the brief extensively argued the merits of the very

claims Petitioner presents to this court on her Hague petition, that Respondent consented to the

child's move to Germany, that he wrongfully retained her in Austria, and that the child was

acclimated to Germany when he took her to Austria. She presents those same issues to this court in

the instant petition.

### Issue preclusion and waiver

As discussed, under Austrian law, by withdrawing her petition, Petitioner is deemed to have

waived the right to re-litigate the issues raised in that proceeding. The preclusive effect of

Petitioner's strategic decision under Austrian law is another consideration which factors against

trying the Hague issues anew in this court.[14] Whether Petitioner is deemed to have waived the right

to re-litigate the child's habitual residence in this court depends in part on whether this court should

accord deference to the procedural waiver under Austrian law under principles of comity.

Petitioner does not contend that the Austrian court was not a court of competent jurisdiction.

Indeed, Austrian decisions have been accorded deference under principles of comity in part because

of its long established principles of jurisprudence. *See Strauss v. Conried* 121 F. 199, 200

---

[14] Few cases have considered what is required to effect a waiver of rights under the Hague Convention or ICARA. In *Journe v. Journe*, 911 F. Supp. 43 (D.P.R. 1995), the district court held that a father waived his right to invoke the Hague Convention to seek return to France of his child, a habitual resident of France, by voluntarily dismissing the underlying divorce and custody action he previously initiated in France. 911 F. Supp. at 46-48. The Court reasoned that the Hague Convention's return remedy is intended to secure the opportunity for an adjudication of the custody dispute in the country of the child's habitual residence, and that the father's voluntary dismissal of the French divorce and custody action indicated an intent to abandon that opportunity. *Id.*

(C.C.S.D.N.Y. 1902); *Hilton v. Guyot*, 159 U.S. at 223 ("In Austria the rule of reciprocity does not rest upon any treaty or legislative enactment, but has been long established by imperial decrees and judicial decisions upon general principles of jurisprudence.").

Nor do dissimilarities between the Austrian judicial proceedings and those in the United States preclude deference. *In re Hague Application*, No. 4:07CV1125, 2007 WL 4593502, at *8 (E.D. Mo. Dec. 28, 2007) ("The fact that the Dutch Court procedures may differ in some respects from standard United States courts' procedures does not alter this finding because 'the fairness of the Dutch court procedures does not depend on its similarity or dissimilarity with United States court procedure but only upon its basic fairness.'") (quoting *Van Den Biggelaar*, 978 F. Supp 848, 856 (N.D. Ind. 1997) (citing *Ingersoll Milling Machine Co. v. Granger*, 833 F.2d. 680, 688 (7th Cir.1987)).

The adjudication by the Austrian appellate court that the dismissal of Petitioner's appeal constituted a waiver of her claims should, considering the purpose and intent of the Hague Convention, be accorded deference. Petitioner should therefore be barred from re-litigating the issues (or claims) she waived under Austrian law. Although the Austrian rule refers to the waiver of "claims," the principle of issue preclusion, as opposed to claim preclusion, seemingly applies, since the underlying decision on the merits of Petitioner's Hague Convention claims was rendered a nullity under Austrian law and therefore does not exist as a judgment *per se. See Coors Brewing Co. v. Mendez-Torres,* 562 F.3d 3, 9 (1st Cir. 2009) (discussing distinction between claim preclusion and issue preclusion), *abrogated on other grounds, Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 2010). The principles underlying claim and issue preclusion has recently been discussed by the Supreme Court:

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." (Citation omitted). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. (Citation omitted). By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." (Citation omitted)

*Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

Whether based on claim preclusion or issue preclusion, under principles of comity this court accords deference to the procedural waiver under Austrian law and bars Petitioner from re-litigating her claims here.

### The merits

If Petitioner is not barred from re-litigating her Hague Convention claims, she failed to sustain her burden of proof on the merits of her petition. It is apparent and the court so finds that at the time of the child's removal to Germany by Petitioner, the parents did not have a settled intent to permanently remove the child to Germany. Moreover, Petitioner, in order to facilitate the move to Germany, engaged in a degree of deception, failing to disclose to Respondent that she intended to move to Germany with the child and take up with her new male friend, never intending to return to the United States. It follows that Germany could not have been the child's habitual residence when Respondent took her to Austria in April, 2010 for the Easter holiday.

When Respondent began to suspect that Petitioner did not intend to return to the United States, he tried to convince her to reconcile and return. The parties' emails demonstrate

Respondent's attempts to convince Petitioner to return with the child, and underscore his lack of

agreement with the child remaining in Germany.  Respondent's actions, considered in context,

demonstrate that he never agreed that the child would be permanently relocated to Germany. Rather,

the evidence describes a father who acquiesced in the move to Germany as a temporary separation,

and one who facilitated the separation in hopes of regaining the favor of his wife's attention and

love. He always intended that the child's permanent place of residence would remain in Largo,

Florida.

Petitioner has the burden of proof with respect to proving a wrongful retention under the

Hague Convention, as implemented by ICARA. 42 U.S.C. § 11603(e)(1).  She has not done so.

Article 3 of the Hague Convention defines a removal or retention as "wrongful" when:

> a. it is in breach of rights of custody attributed to a person . . . either
> jointly or alone, under the law of the State in which the child was
> habitually resident immediately before the removal or retention . . .
> .

While the court certainly does not approve of Respondent's conduct in taking the child to the

United States without notice to Petitioner or the Austrian court, his removal of the child from

Germany to Austria and his refusal to return the child to Germany was not "wrongful" under the

Hague Convention, since her habitual residence was in Florida.[15] Neither had she assimilated to

Germany such that Germany had become her habitual residence.

Petitioner's evidence of assimilation was not persuasive. The child's enrollment in school

in Vellberg had been arranged by Petitioner without Respondent's knowledge. Moreover, as each

---

[15] Since the child's habitual residence was the United States, Respondent's return of the child to the United States was not "wrongful" under the Hague Convention, *see Barzilay v. Barzilay*, 600 F.3d 912, 917 (8th Cir. 2010) (citing *Silverman*, 338 F.3d at 897 n.17); *Tsai-Yi Yang*, 499 F.3d at 271; *Karkkainen*, 445 F.3d at 291, and Article 12 would not require the court to return the child to Germany as it was not the child's habitual residence, *see Asvesta v. Petroutsas*, 580 F.3d at 1017.

court which has examined the issue has found, the child was not in Vellberg long enough to have assimilated there. In sum, the evidence in support of assimilation was essentially contrived by Petitioner and her unilateral actions. The child's habitual residence was and remains Largo, Florida. Accordingly, the petition fails on the merits.

Accordingly, the  Petition for Return of Child to Petitioner brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Dkt. 1) is **DENIED**. The Clerk is directed to enter judgment in favor of Respondent, deny all pending motions as moot and close this case.

**DONE AND ORDERED** this *10*ᵀᴴ day of March, 2011.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: counsel of record